IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 9, 2022

**STATE OF TENNESSEE v. DARICK A. HINERMAN**

**Appeal from the Circuit Court for Robertson County**
**No. 74CC-2018-CR821     Jill Bartee Ayers, Judge**

_____

**No. M2021-00251-CCA-R3-CD**

_____

The Defendant, Darick A. Hinerman, was convicted by a Robertson County Circuit Court jury of first degree premeditated murder. *See* T.C.A. § 39-13-202 (2018) (subsequently amended). The trial court imposed a sentence of life imprisonment. On appeal, the Defendant contends that (1) the evidence is insufficient to support his conviction, (2) the trial court erred by denying his motion to suppress evidence recovered during a warrantless search, and (3) the trial court erred during jury instructions. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Eric J. Yow, Clarksville, Tennessee, for the appellant, Darick A. Hinerman.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Robert J. Nash, District Attorney General; and Jason White, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from the October 6, 2018 fatal shooting of Brodie Wilkinson III. The Defendant and two codefendants, Daniel Blake Scott and Elizabeth Henning, were indicted for first degree premeditated murder. The Defendant did not deny shooting the victim but asserted that he did not intend to kill the victim. The trial court granted the Defendant's motion to sever, and his case proceeded to trial on August 10, 2020.

At the trial, Brodie Wilkinson, Jr., the victim's father, testified that at the time of the victim's death, he and the victim lived on their family farm and that a creek ran through the property. He estimated that the distance between the creek and their home was about one mile. He said that the creek attracted frequent trespassers, who were a liability should they have been injured and who left behind trash.

Mr. Wilkinson testified that on October 5, 2018, his father passed away after a lengthy illness. Mr. Wilkinson said that on October 6, he went to his father's home, which was likewise located on the family farm, and that he and his wife had an appointment at the funeral home at 2:00 p.m. He said that he left his father's home, drove home to pick up his wife, and saw trespassers at the creek. He recalled that he saw a dark four-door Jeep "riding through the creek" and a white Dodge car parked beside the roadway. Mr. Wilkinson said that nobody had permission to be on the property. He said that he did not stop to talk to the people inside the Jeep because he was late for his appointment, that he picked up his wife, and that they drove toward the funeral home. He said that as he drove down the driveway, the victim approached in his truck, that they stopped, and that he told the victim to "[r]un them off, I have stuff I have to take care of." Mr. Wilkinson said it had not been uncommon for him to ask the victim to run off trespassers. Mr. Wilkinson said that this was the last time he saw the victim alive. Mr. Wilkinson testified that before he arrived at the funeral home, he received a telephone call informing him that the victim had been involved in a motor vehicle accident and that he drove to the scene.

Vicky Dorris, the Robertson County Paramedic Supervisor, testified that she responded to the scene of the motor vehicle accident involving the victim. She said that the victim was unresponsive and without a pulse. She identified photographs of the scene and the truck, which she stated reflected the truck had gone into a ditch and struck a tree, making it difficult to open the doors. She recalled that the victim was pronounced dead at the scene. She said that the victim had a "puncture wound" near the shoulder and neck and that she saw holes, which could have been consistent with bullet holes, in the windshield and the back of the truck seat.

Jason Parker testified that he was driving his vehicle around the time of the victim's motor vehicle accident and that he stopped at an intersection. Mr. Parker said that he heard a truck "revving" and a "muddled sound," that he looked right, that he saw a truck "banging" against the guardrail about two to three times, that the truck passed his vehicle, and that the driver was "laid over . . . [and] slumped down" without any hands on the steering wheel. Mr. Parker said that the truck crossed the roadway, left the roadway, and flipped. He said he called 9-1-1.

Robertson County Sheriff Department Corporal James Edwards testified that he responded to the trespassing call placed by the victim and that as he drove to the scene, he received a call regarding the motor vehicle accident. Corporal Edwards said that he drove to the scene, that paramedics were there, and that he was told the victim was deceased. Corporal Edwards stated that he looked at the victim's body, which showed a puncture wound to the right of the neck. Corporal Edwards stated that the victim's cell phone was found on the driver's side floorboard of the truck. Corporal Edwards said that he did not use rods to determine the trajectory of the bullet.

Brittney Bennett, a Robertson County emergency dispatcher, testified that she received the victim's 9-1-1 call regarding trespassing at the creek. The recording of the call was played for the jury. During the call, the victim reported three trespassers, who refused to leave, were at the creek. The victim stated that two men and one woman were at the creek, that "they tried to fight" him, and that the red-haired man said he had a gun and was not going to leave. The victim said he left the creek. The victim said that the people were still at the creek and were driving a white Dodge Charger. The victim said that he was at his father's friend's house but that he was leaving to go to his grandfather's house.

Ms. Bennett recalled that the victim was "nice and respectful" during the call and that the victim was not "confrontational," which was consistent with the 9-1-1 recording. She agreed that the victim reported that the trespasser who was six feet, two inches tall with red hair told the victim that "they had a gun," not that the trespasser had displayed a gun. She agreed that the victim did not sound frantic during the call.

Adam Adcox testified that he and the victim's father were longtime friends and that the victim had worked with Mr. Adcox for about nine months at the time of the shooting. Mr. Adcox stated the victim was "easy-going" and a "laid-back kid." Mr. Adcox said that on October 6, 2018, the victim came to his house, that the victim looked nervous and "shook up," as though "he had been threatened," and that the victim was talking on his cell phone with 9-1-1. Mr. Adcox said that although the victim never stated the problem, Mr. Adcox discerned from listening to the victim that someone was at the creek. Mr. Adcox said that while the victim was still speaking to the 9-1-1 dispatcher, the victim returned to his truck and left.

Robertson County Sheriff's Detective Darian Hawkins testified that although he was not on duty on October 6, 2018, he drove past the Wilkinson property and saw a white Dodge Charger parked in the gravel area near the creek. Detective Hawkins said that a couple of hours later, he received a telephone call from another officer about the victim's motor vehicle accident and that he responded the scene.

Detective Hawkins testified that he unlocked the victim's cell phone and that a nine-second video recording in the Snapchat application played repeatedly. The recording, which was played for the jury, reflected that it was made while the victim drove his truck on a roadway. As the victim drove, a white Dodge Charger approached from the opposite direction. The Charger came to a stop and a man with red hair, who was later identified as codefendant Scott, left the front passenger seat and walked toward the front of the car. A woman, later identified as codefendant Henning, sat in the driver's seat. As the victim's truck passed the car, a second man, who had dark hair and was later identified as the Defendant, stood at the rear of the car while holding a black handgun. The Defendant and codefendant Scott yelled, although the victim did not speak. After the victim's truck drove past the men and the car, the Defendant was visible in the driver's side mirror of the truck, and the Defendant slightly raised his hand while holding the handgun. After the Defendant was no longer in the camera's view, a noise was audible. The victim screamed.

Detective Hawkins testified that after viewing the recording, he determined the location where the recording was made and that he went to the scene to search for evidence. He said that he found one Luger nine-millimeter cartridge casing about two inches from the roadway asphalt. He said that he used the landmarks depicted in the recording to determine that, at the time of the shooting, the approximate distance between the victim and the Defendant was fifteen feet. He said that a fired bullet was found on the victim's truck floorboard.

Detective Hawkins testified that he received an anonymous tip about the location of the white Dodge Charger and that the information led him to a home at midnight after the 2:10 p.m. shooting. Detective Hawkins said that he and other detectives knocked on the door and that Joshua Hinerman, the Defendant's cousin and the homeowner, opened the door. Detective Hawkins recalled that they wore body armor and had their weapons drawn. Detective Hawkins said that he asked Mr. Hinerman who owned the white Charger parked outside and that Mr. Hinerman identified codefendant Henning as the owner. Detective Hawkins said that, based upon the information in the tip, he asked Mr. Hinerman if the Defendant, codefendant Henning, and codefendant Scott were inside the home and that Mr. Hinerman allowed him and the other detectives to enter the home. Detective Hawkins said that Mr. Hinerman showed the detectives which bedroom belonged to the Defendant and gave Detective Hawkins permission to enter the bedroom. Detective Hawkins stated that the Defendant was asleep on the bed and that a black Remington RP9 handgun lay on the bed beside the Defendant. Detective Hawkins said that the handgun, which was loaded with nine-millimeter Luger bullets, was secured and that they woke the Defendant.

Detective Hawkins testified that he went to the upstairs bedroom occupied by codefendants Scott and Henning. Detective Hawkins said that although no firearms were

found in their bedroom, three nine-millimeter Luger bullets were found in codefendant Scott's pocket. Detective Hawkins said that the Defendant and the codefendants were taken to the police station and that the Defendant's cell phone was obtained for analysis.

Detective Hawkins identified the cell phone call log information obtained from the Defendant's phone and testified that the log showed that the Defendant placed two calls after the shooting. Detective Hawkins stated that the calls were placed at 2:40 p.m., which lasted nine seconds, and 2:47 p.m., which lasted forty-two seconds, to a contact labeled "Alicia." Detective Hawkins identified text message records from the Defendant's phone and stated that at 2:51 p.m., the phone received an incoming message from Alicia stating, "Get rid of the gun." The phone received additional messages from Alicia at 3:35 p.m., asking if the Defendant was okay and stating that she was "sick to my stomach." The Defendant's phone sent a message to Alicia stating, "Yeah," and asking what Alicia was doing. At 4:05 p.m., the Defendant's phone received a message from Alicia asking if she could call the Defendant, but no response was sent from the Defendant's phone.

Detective Hawkins testified that during his investigation of the hours leading to the shooting, he learned that the Defendant and the codefendants went to various businesses. Video recordings from the businesses were played for the jury. Detective Hawkins stated that codefendant Scott purchased ammunition at Walmart, that codefendant Henning bought Fireball at the liquor store in the morning, that codefendant Scott purchased Fireball in the afternoon, and that the three went to Sudden Service around 11:30 a.m. or noon. Detective Hawkins stated that the video recording from Sudden Service showed the codefendants, along with two beer cans and one malt beverage can matching what was recovered from the creek. Detective Hawkins stated that the Defendant and the codefendants were seen in the recording from the convenience store after the shooting and that the recording showed codefendant Henning purchase two twenty-four ounce beer cans. Detective Hawkins stated that Casey's General Store was located in Russellville, Kentucky, and that the Defendant and the codefendants were seen entering the store at 7:36 p.m.

On cross-examination, Detective Hawkins testified that he did not recall seeing any no trespassing signs at the creek. He said relative to the bullet's entry of the victim's truck that if the firearm had been fired a few inches higher, the bullet could have "shattered glass" and that if the firearm had been fired a few inches lower, the bullet could have entered the "sheet metal of the forward part of the bed" or the tailgate.

Detective Hawkins testified that the video recording on the victim's cell phone showed that the Defendant held the handgun in his right hand and "squared up with the back of the truck" before the Defendant was no longer in the camera's view.

Detective Hawkins testified that the Defendant had stayed at Mr. Hinerman's home for about two weeks at the time of the shooting. Detective Hawkins stated that the handgun found beside the Defendant belonged to codefendant Scott and that it contained eight bullets, which were consistent with the cartridge casing found at the location where the victim made the video recording. Detective Hawkins recalled that the Defendant made a statement when his DNA sample was collected and said that the Defendant might have said he did not know he "hit" the victim because the victim continued driving.

Robertson County Sheriff's Detective Terry White testified that he responded with Detective Hawkins to Mr. Hinerman's home. Detective White said that the Defendant did not struggle or attempt to flee after he and the other detectives woke the Defendant. Detective White said that the Defendant did not curse or yell and that the Defendant did not attempt to reach for the handgun. Detective White said that he examined the victim's truck and that he concluded the bullet entered the rear of cab, struck the seat, struck the victim, traveled into the plastic portion of the dash, and fell onto the floorboard.

Greenbrier Police Officer Charles Arms testified that at the time of the victim's death, he was a detective with the Robertson County Sheriff's Department. He reviewed the video recording on the victim's cell phone. A slow-motion version of the recording was played for the jury. Officer Arms stated that he retrieved photographs from the slow-motion recording, which were received as a exhibits and which showed the Defendant holding the handgun. Officer Arms agreed that the recording did not show whether the Defendant had his finger on the trigger and that the Defendant disappeared from the camera's view before the shooting occurred. Officer Arms agreed that the recording did not show the Defendant raise the handgun to "eye level." Officer Arms said that only one-half second elapsed between the Defendant's moving out of the camera's view and the gunshot.

Codefendant Jennifer Henning testified that she and codefendant Scott met when they both worked at Walmart and that they began a romantic relationship in November 2017, at which time codefendant Scott rented a bedroom inside Mr. Hinerman's home. She said that in December 2017, she frequently stayed overnight at the home. She said she met the Defendant in June 2018, at which time the Defendant stayed at the home for about one week. She recalled that the Defendant visited from Ohio in June 2018 but that he returned in September 2018 and began living in a bedroom Mr. Hinerman had converted from a home office. She said that she, the Defendant, and codefendant Scott began spending time together after the Defendant moved to Tennessee.

Codefendant Henning testified that on October 8, 2018, she, codefendant Scott, and the Defendant woke around 9:30 a.m. and that they ran errands, which included going to Walmart to pick up her prescription and to purchase ammunition for target practice later in the day. She said that she and codefendant Scott purchased ammunition in the hunting department while the Defendant "went off on his own," that they met in the electronics department to purchase a speaker, and that they left Walmart. She said that they went to a convenience store, at which codefendant Scott bought two tallboy beers each for himself and the Defendant, that they ordered a pizza, that they went to a liquor store, at which she purchased one pint of Fireball, and that they picked up the pizza. She said that they went home for a few minutes, that they returned to Walmart in order for the Defendant to return headphones, and that the three of them returned home. She said that she and the Defendant ate pizza and that all three of them drank Fireball. She said that afterward, they decided to go to the creek, which they had been to Friday before the shooting. She said that nobody had asked them to leave on the previous occasion.

Codefendant Henning testified that she drove to the creek and recalled that the handgun was inside the glovebox at this time. She said that the handgun "usually stayed in the car." She said that before going to the creek, she again drove to a convenience store, at which she and codefendant Scott purchased two tallboy beers each for him and the Defendant and a tallboy malt beverage for her. She said that they swam and drank when they arrived at the creek. She said that also at the creek was a dark-colored Jeep with four or five people riding around in the creek. She said that the Jeep left the area and that the victim arrived.

Codefendant Henning testified that although she did not have a full view, she heard the victim and codefendant Scott yelling at each other about whether they were trespassing on the victim's property. She said that she moved in order to see everyone and that codefendant Scott swam toward the side of the creek where the victim sat inside the victim's truck. She said that codefendant Scott left the creek, walked to the victim's truck, and yelled at the victim. She said that although the victim stayed inside the truck, codefendant Scott was close to the truck. She could not hear what codefendant Scott and the victim yelled. She said that the Defendant was sitting on an embankment two feet from her at this time and that he began yelling and cursing. She said that the Defendant stated, "[I]f you will put the video recorder up, we will leave." She said that the victim held a cell phone during the exchange and that he did not display a weapon. She said codefendant Scott's handgun stayed inside the glovebox during the exchange. She said that she yelled for codefendant Scott to return to the other side of the creek, where she and the Defendant were, in order for them to leave, that it took four or five minutes to "get him to come back over," and that she collected their belongings, they walked to the car, and they left the area.

She said the victim drove away, too, but that the victim drove by her car before they left the area.

Codefendant Henning testified that codefendant Scott and the Defendant were "[d]runk and angry" but that they walked up the embankment and to the car without falling. She said that the Defendant and codefendant Scott yelled and cursed as they walked to the car. She agreed that although they had consumed alcohol, the men were "still able to move, talk, and do all that." She said that she asked the men which direction she should drive and that codefendant Scott and the Defendant each told her to follow the victim. She said that she looked at codefendant Scott and asked which way because although she knew there were other routes home, she did not know them well. She said she wanted to drive in the opposite direction from the victim. She said that codefendant Scott told her to follow the victim and that she complied.

Codefendant Henning testified that as she drove, codefendant Scott and the Defendant saw the victim's truck driving toward her car and that both men told her to stop the car. She said she slowed but did not stop the car. She said that the Defendant asked codefendant Scott for the handgun, that she looked at codefendant Scott and said, "No," and that the Defendant said he was only going to "scare [the victim] a little bit." She said that codefendant Scott "agreed" and stated that the Defendant was only going to scare the victim. She said that codefendant Scott handed the handgun to the Defendant, that both men "jumped" out of the car, that codefendant Scott went to the front of her car, and that the Defendant went to the rear of her car. She said that she heard a gunshot, that the men returned to the car, and that the men told her to drive home. She said that the Defendant held the handgun and stated it had jammed. She said that the Defendant stated he "had shot the truck and that he would have shot more if the gun had not jammed." She testified later that she "was freaking out," that codefendant Scott told her the Defendant did not mean to "hit him," and that the Defendant stated he "did mean to hit him . . . I'm a pretty damn good shot."

Codefendant Henning testified that before they arrived home, codefendant Scott and the Defendant wanted to purchase more beer and that she purchased beer. She said that the men were more "buzzed than drunk" by this time. She said that when they arrived home, codefendant Scott put away the handgun, that she took a shower, and that the Defendant sat on the front porch drinking beer. She said that codefendant Scott apologized and denied knowing the Defendant "would do that." She said that later, she fell asleep on the porch swing and that she woke to the sound of "the gun cocking back." She said that the Defendant was "fooling" with the handgun and that she yelled for him to put away the gun. She said that she and codefendant Scott went inside and napped for about thirty minutes and that codefendant Scott received a phone call from someone looking for the

-8-

Defendant. She said that after the call, they woke the Defendant, who had been asleep in his bedroom. She said she drove the men to purchase more beer and Fireball and that they went to a nearby park. She said that before going to the convenience store and to the park, she looked at her cell phone for information about the incident. She said that while at the park, the Defendant asked her, "[Y]ou're really scared, aren't you?" She said that she admitted she was scared but that the Defendant did not appear scared. She thought the Defendant "seemed really cocky and arrogant." She said that they left the park and drove to Casey's General Store. She said that while at the general store, she looked at her phone and told the men, "[W]e've got a problem." She said that after they read the information on her phone and realized the victim had died, they agreed they needed to go home. She said that the men discussed turning themselves in to the police and that the Defendant, at one point, discussed purchasing a bus ticket to return to Ohio but decided against it.

Codefendant Henning testified that after they arrived home, the three of them discussed the shooting. She stated that the Defendant said, "I can't believe I really did it? . . . I meant to hit the tailgate." She said that all three of them intended to turn themselves in to the police but that the police came to the home. She said that the handgun remained in the Defendant's pants pocket from the time they arrived at the park until they arrived home the last time.

Codefendant Henning recalled that codefendant Scott owned the handgun used during the shooting in this case and that she had fired it previously at her mother's home. She said that the handgun "jammed up" every time it was fired.

Codefendant Henning testified that she willingly spoke to the police after her arrest but that she omitted some information, including codefendant Scott's handing the handgun to the Defendant and the Defendant's statements about the shooting. She said that she had been scared, had never been in trouble with the police, and had attempted to protect codefendant Scott. She said, though, that within one week of the shooting, she provided a truthful statement after consulting legal counsel and that she testified at the preliminary hearing. She denied that her trial testimony was predicated on a plea agreement and said that her first degree murder charge was pending.

On cross-examination, codefendant Henning testified that while they drank alcohol and ate pizza before going to the creek, each of them drank about one-third of the bottle of Fireball but that the Defendant drank a little more than she and codefendant Scott. She did not recall any no trespassing signs posted at the creek and said she did not think they had trespassed. She said that the Defendant had drank one-third of a pint of Fireball and two tallboy beers, which would have created a "really good buzz," but not necessarily made

him intoxicated. She agreed, though, the men were "drunk." She said there had been no discussion about shooting anyone as they drove away from the creek.

Codefendant Henning testified that after she heard the gunshot, the victim drove away "like nothing had happened" and that she did not know the bullet had struck anything. She agreed that, at the time of the shooting, the Defendant did not know that the victim had been shot and that there "was no reason to think, at least at that point, that anyone had been shot or even hurt." She agreed that the Defendant said he "shot at the truck" when he returned to her car after the shooting. She agreed that the men only discussed fighting the victim and that there had been no plan to track down and kill anyone. She agreed that the Defendant was intoxicated at the park because he had drank two pints of Fireball and many tallboy beers. She agreed that they knew the victim had been in a motor vehicle accident when they were at the park but that they did not know the victim had been shot. She said that the Defendant and codefendant Scott had each drank about six or seven tallboy beers.

Codefendant Henning testified that the Defendant and codefendant Scott first learned the victim had been shot when they were at the general store and that the men were "freaking out." She said that the Defendant grabbed his mouth, bit his fingernails, and grabbed his forehead when he learned the victim had been fatally shot. She said that the Defendant drank the second bottle of Fireball on the way to the general store and continued drinking during the drive home. She agreed that the Defendant said he only meant to hit the tailgate and that this statement was consistent with the Defendant's statement at the time of the shooting.

Joshua Hinerman, the Defendant's cousin, testified that he and codefendant Scott were childhood friends and that codefendant Scott rented a bedroom at his home. Mr. Hinerman said that he allowed codefendant Henning to stay overnight at the home, as well. He said that the Defendant moved to Tennessee from Ohio and that he allowed the Defendant to stay at the home without paying rent.

Mr. Hinerman testified that on October 7, 2018, he left home for work around 4:30 a.m. and returned home around 4:00 p.m., that he fell asleep, that he woke to loud music being played by the Defendant and the codefendants on the front porch, and that he returned to sleep. He said that he later woke to the police "banging on the door" and that he opened it. He said that he consented to the officers' coming inside, that the officers explained why they were at the home, and that he told the officers where the Defendant and the codefendants were inside the home. He said that he sat at the kitchen table while the officers went into the Defendant's and the codefendants' bedrooms. He said that he told the officers that codefendant Scott had a firearm because he did not want "them to blow

-10-

holes all up in my house" and that he did not know the firearm was in the Defendant's bedroom.

Robertson County Sheriff's Deputy Christopher Baum testified that he was the booking officer on duty at the time of the Defendant's arrest. He said that he completed the Defendant's booking paperwork and that the Defendant was "laughing and smiling a lot" and told jokes. He said that after completing the paperwork, the Defendant placed a telephone call and that he overheard the Defendant state, "I'm the one that pulled the trigger, and the other two were just with me." Deputy Baum did not recall whether the Defendant cried during the call.

Dr. Erin Carney, an expert in forensic medicine, performed the autopsy and testified that the victim's cause of death was a gunshot wound to the back and that the manner of death was homicide. She said that the bullet entered the victim's back before exiting the body. She concluded that the bullet struck an object before entering the victim's back and that the handgun was fired from a distance. Photographs of the gunshot wound were received as exhibits.

The twenty-seven-year-old Defendant testified that he had previous convictions for burglary and theft, which occurred in 2014 and 2018, respectively, before the shooting in this case. He stated that he moved to Tennessee to live with Mr. Hinerman approximately one week before the victim's death and that he found employment before the shooting. He said that the day of the shooting was supposed to be a day to celebrate his finding a job and that he woke to codefendant Scott's opening a beer can. He said that he began drinking alcohol as soon as he woke that morning. He said that he and the codefendants went to Walmart, at which he purchased a speaker and clothes for his new landscaping job. He said that they left Walmart, purchased Fireball at the liquor store, picked up a pizza, returned home, and ate and drank. He said that he drank about one-half pint of Fireball and a couple of beers. He said that he suggested going swimming and that codefendant Scott suggested the creek. The Defendant said that he had been to the creek once before the day of the shooting, that he had never had any issues, and that he did not see any no trespassing signs. He said that they did not "mean any harm" by trespassing and that they only wanted to swim and enjoy the day. He admitted that he drank more beer while at the creek. He said that at this point, he had probably consumed about six to seven tallboy beers and one-half pint of Fireball.

The Defendant testified that the victim arrived at the creek in a truck while he sat on an embankment near codefendant Henning. He said that the victim was on the side of the creek opposite from where he sat on the embankment. He said that the victim wanted them to leave because they were trespassing, that codefendant Scott told the victim they

-11-

were at a public creek and to leave them alone, and that the argument was "heated." The Defendant said that codefendant Scott swam toward the victim's truck and left the creek and that at one point during their exchange, codefendant Scott struck the victim's truck, "beat on his chest," and told the victim he wanted to fight. The Defendant said that the victim held a cell phone and that the Defendant told the victim that they would leave if the victim stopped recording them. The Defendant said that the victim drove away and that they left, as well.

The Defendant testified that as they were leaving the creek, the victim drove by them, that the victim yelled at them, and that the Defendant yelled, "I don't understand. We're trying to leave. What do you want us to do?" The Defendant said that the victim made a U-turn, passed them again, and that more yelling occurred. He said that eventually, the victim drove away and that they got inside codefendant Henning's car and left. He said that they saw the victim on the roadway traveling in the opposite direction and that the Defendant and codefendant Scott each told codefendant Henning to stop the car. The Defendant said that he was angry that the victim "kept following" them and would not leave them alone and that he wanted to fight the victim. The Defendant said that as the car came to a stop, he asked codefendant Scott for the handgun inside the glovebox because he wanted to "fire off a scare shot" to make the victim stop following them. He said that he fired the handgun, intending to strike the tailgate, from the rear of the car. He said that there had not been a plan to shoot anyone and that he only wanted to scare the victim, who ruined their day. He said that he did not mean to harm or kill the victim.

The Defendant testified that before he fired the handgun, he had his "arms open," that he shifted, and that he fired. He said that he did not raise the handgun to eye level, that he did not use the handgun's sights, and that he did not use both of his hands when he fired the handgun. He thought the victim's truck passed at thirty-five or forty miles per hour. He thought he aimed at the tailgate. He said that he learned of the victim's death when he was at the general store and that he became scared, upset, and "freak[ed] out." He said he "was just lost for words." He agreed that the portion of the video recording from the general store showing him grasp his face was the moment he learned the victim had suffered a fatal gunshot wound.

The Defendant testified that he discussed with the codefendants turning himself in to the police and that he spoke to his sister, Alicia, about the incident. He denied attempting to dispose of the handgun and said that he wanted to "own up" to the shooting and that he had suicidal thoughts before going to sleep. He denied that he laughed about the shooting while at the police station and said that he cried while speaking on the telephone to his cousin during the booking process. He said that he did not intend to kill anyone "because it's wrong."

-12-

The Defendant testified that although he had previous experience with rifles and shotguns, he had never fired a handgun before of the day of the shooting.

On cross-examination, the Defendant testified that he was "pissed off" when the victim drove by as he and the codefendants were collecting their belongings to leave the creek. The Defendant said that he was attempting to leave but that the victim would not leave them alone. The Defendant said that the victim spoke as he drove by, which made everyone angry, but that the victim did not threaten anyone. He agreed that he and codefendant Scott told codefendant Henning to follow the victim's truck because he wanted to "fistfight" the victim. He agreed that he "was taking a gun to a fistfight" when he got out of Ms. Henning's car. He said, though, that he knew the victim was not going to stop the truck and that, as a result, he wanted to fire a "scare shot and just end the whole thing." He denied that he wanted the handgun to have an advantage during a physical altercation with the victim. He agreed it would have been smarter to have fired the gun at the ground or in the air.

The Defendant testified that he did not check on the victim's well-being because he did not know the victim had been shot. He denied saying that he would have fired the handgun more if it had not jammed, that he meant to shoot the victim, and that he was a "good shot." He agreed that he spoke to his sister on the telephone at 2:27 p.m. and that she told him in a text message to get "rid of the gun" at 2:51 p.m. He agreed that the recording from the general store showed that it was 7:30 p.m. and dark outside. He explained that not long after the shooting, he learned the victim's truck had been involved in an accident but that he did not learn of the victim's death until he was at the general store. The Defendant said that he was devasted when he learned he caused the victim's death.

The Defendant testified that although he recalled drinking Fireball and six or seven beers before the shooting, he did not recall the amount of alcohol he consumed after the shooting. He said that he drank heavily after the shooting and that he "stress [drank]."

The Defendant testified that although he meant to pull the handgun's trigger, he did not mean to shoot the victim. The Defendant said he knew the victim was inside the truck when he fired the gun at the tailgate. On redirect examination, the Defendant testified that he did not pull the trigger more than once.

Christopher Robinson, a forensics and crime scene reconstruction expert, testified that he examined all the evidence in this case, including the victim's truck, and went to the crime scene. He said that he conducted a trajectory analysis on the truck using rods to determine the bullet's path. He concluded that the bullet entered at the rear cab of the truck

and that he placed a trajectory rod in the bullet entry hole. Photographs depicting the same were received as exhibits. Referring to the photographs, Mr. Robinson concluded that the bullet entered the cab approximately one and one-half inches above the rear truck bed, which was affixed the rear of the cab. He explained that the bullet missed the bed of the truck near the cab by one-and-one-half inches. He concluded that if the bullet had struck the truck one or two inches lower, the bullet would have struck near the cab and that because the truck bed was composed of "heavier gauge metal," the bullet "would have probably stopped" and not entered the cab. He said that at a minimum, the bullet would have slowed a substantial amount based upon the bed containing a second layer of metal. He said that if the handgun had been fired four to five inches lower, the bullet would have struck the rear tailgate and that the bullet would have stopped in the rear tailgate.

Mr. Robinson testified in connection with the video recording from the victim's cell phone that the truck traveled 338 feet at 25.5 miles per hour, or 37.5 feet per second, during the recording. He said that the critical issue was the distance from the location where the handgun was fired at a moving target. He concluded that the handgun was fired approximately 50 feet from the truck. He said that to fire a handgun at a target moving at 25 miles per hour after a "snap draw" was extremely difficult and that he could only identify five people in the world would could "do that." He stated, as well, that to fire a handgun with a firm stance and grip and to strike a target moving at twenty-five miles per hour "would be exceptional." He said that although he did not know the Defendant, "this shot is amazing."

On cross-examination, Mr. Robinson testified that his conclusions were based upon the assertion that the Defendant aimed at the truck's tailgate. Mr. Robinson stated that if the bullet had entered the cab one and one-half inches higher, it might have struck the victim's head.

On rebuttal, Detective Hawkins was recalled and testified that he measured the distance between the Defendant and the back of the cab of the victim's truck at the time of the shooting and that he determined the distance was twenty-three feet. He said that he did not use any instruments to determine the trajectory of the bullet and that he "went out on this road, when you walk down the road, you can see the angles when you're walking down the road."

Upon this evidence, the jury found the Defendant guilty of first degree premediated murder. This appeal followed.

-14-

# I.  Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his conviction because the State failed to establish he acted with premeditation.  He asserts that his conviction should be reversed and the case remanded for a new trial and, alternatively, that his conviction should be reduced to second degree murder, manslaughter, or reckless homicide.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

First degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. §§ 39-13-201 (2018), 39-13-202(a)(1).  In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); *see* T.C.A. § 39-11-106(a)(18) (2018) (subsequently amended) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result").  "It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." T.C.A. § 39-13-202(d). "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006).  As a result, the jury "may infer premeditation from the manner and circumstances of the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); *see State v. Vaughn*, 279 S.W.3d 584, 595 (Tenn. Crim. App. 2008).  Our supreme court has provided a list of factors which "tend to support the existence" of premeditation and deliberation.  *See Bland*, 958 S.W.2d at 660.  The list includes the use of a deadly

weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Id*. (citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1997)).

The underlying facts of this case are not disputed by the parties. The only issue is whether the Defendant killed the victim intentionally and with premeditation. In the light most favorable to the State, the evidence shows that the victim drove to the creek to disperse trespassers and that he found the Defendant and the codefendants. The Defendant and codefendant Henning sat on an embankment, while codefendant Scott was in the creek. An animated verbal altercation initially ensued between the victim and codefendant Scott, which culminated in codefendant Scott's approaching and hitting the victim's truck. The victim was calm and remained inside the truck, and the Defendant argued with the victim from the embankment, disputing that they were trespassing. Ultimately, the argument ended with the Defendant's telling the victim that they would leave if the victim, who held a cell phone, would stop recording them. The Defendant was "[d]runk and angry" when he and the codefendants left the creek. Before they could leave the creek, the victim drove past their car, and the Defendant and codefendant Scott each instructed codefendant Henning to travel in same direction as the victim. Codefendant Scott sat in the front passenger seat, and the Defendant sat in the rear passenger seat.

As codefendant Henning drove, the victim's truck approached her car from the opposite direction. She slowed the car at the direction of the Defendant and codefendant Scott, and the Defendant requested the handgun from the glovebox. After procuring the handgun, but before getting out of the car, the Defendant stated that he wanted to fight and to "scare [the victim] a little bit." Codefendant Scott and the Defendant left the car. As the victim drove by codefendant Henning's car, codefendant Scott stood at the front of the car and yelled at the victim. The Defendant did the same from the rear of the car. The recording from the victim's cell phone showed that as the victim's truck drove past the car, the Defendant held the handgun to his side and slightly raised his hand. After the Defendant was no longer in the camera's view, a single gunshot was heard. The victim did not display a weapon at any time.

After the Defendant fired the handgun, the men returned to the car, at which time the Defendant said he "had shot the truck and that he would have fired more if the gun had not jammed." Although codefendant Henning testified that the Defendant stated he intended to strike the truck, she also testified that immediately following the shooting the Defendant said he "did mean to hit him . . . I'm a pretty damn good shot." Although the Defendant denied saying this during his testimony, the jury determined the credibility of

the witnesses and resolved any conflicts in the evidence. *See Bland*, 958 S.W.2d at 659; *see Sheffield*, 676 S.W.2d at 547. The jury's verdict reflects that it credited codefendant Henning's testimony that the Defendant stated he intended to "hit him," referring to the victim.

After the shooting, the Defendant did not turn himself in to the police when he learned the victim had suffered a fatal gunshot wound. Rather, he continued drinking alcohol. He was seen laughing, smiling, and telling jokes during the booking process after his arrest. The Defendant admitted during his trial testimony that he intentionally engaged in the conduct that resulted in the victim's death. He testified that he meant to fire the handgun and that he knew the victim was inside the truck. Coupled with the evidence of his statements after the shooting that he would have fired the handgun more if it had not jammed, that he meant to shoot the victim, and that he was a "good shot," we are compelled to conclude that a rational jury could have determined beyond a reasonable doubt that the Defendant killed the victim intentionally and with premeditation. The evidence is sufficient to support his first degree murder conviction. He is not entitled to relief on this basis.

## II.     Motion to Suppress

The Defendant contends that the trial court erred by denying his motion to suppress the handgun obtained from inside his bedroom as a result of the police's warrantless entry. The State responds that the trial court did not err by denying the motion to suppress. We agree with the State.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

At the suppression hearing, Detective Hawkins testified consistently with his trial testimony regarding his investigation leading to the receipt of an anonymous tip about the location of the Dodge Charger after the shooting. Detective Hawkins stated that Sergeant Jake Ryan related that someone had called stating that the Defendant was believed to be the person who was inside the white Dodge Charger and "committed the shooting" and that the caller provided an address, which was later determined to be a home owned by Mr. Hinerman, the Defendant's cousin. Detective Hawkins stated that based upon the information contained in the tip, he and other detectives went to Mr. Hinerman's home to look for the white Dodge Charger. He said that the car was parked "all the way to end of the driveway," which was closest to the backyard.

Detective Hawkins testified that he and other detectives and deputies approached the house and knocked on the front door. He said that his weapon was in its holster but that Detective Morris had his "patrol rifle . . . hanging down in front of him." Detective Hawkins said that Mr. Hinerman opened the door, that he asked Mr. Hinerman to step outside, that Mr. Hinerman complied, and that he told Mr. Hinerman why the detectives were at the home. Detective Hawkins said that he asked who owned the Dodge Charger and that Mr. Hinerman stated the car belonged to codefendant Henning. Detective Hawkins said that he asked Mr. Hinerman if the Defendant was home and that Mr. Hinerman said the Defendant and the codefendants were home. Detective Hawkins said that he asked Mr. Hinerman if he and the detectives could come inside to "get" the Defendant and that Mr. Hinerman said, "[Y]es . . . but let me put my cats up first." Detective Hawkins said that after two minutes of waiting on the porch, Mr. Hinerman identified the downstairs bedroom across from the living room as the Defendant's bedroom.

Detective Hawkins testified that he and the detectives yelled for the Defendant to come out of the bedroom but that he did not hear anything from inside the bedroom. Detective Hawkins stated that the Defendant's bedroom door was not locked and that he and Detective Morris opened the door and entered the bedroom. Detective Hawkins said that the Defendant lay asleep across the bed with the handgun on the bed beside the Defendant. Detective Hawkins said that the handgun was secured and that they woke the Defendant. Detective Hawkins said that they asked the Defendant if he knew why they were at the home, that the Defendant acknowledged he knew, and that the Defendant was arrested and taken out of the home. Detective Hawkins stated that he looked at the Defendant before waking him and that the Defendant appeared to be the same person in the video recording on the victim's cell phone.

On cross-examination, Detective Hawkins testified that he did not attempt to obtain a search warrant for Mr. Hinerman's home. He said that although he placed a "BOLO" on

the car with a description of the three occupants, he did not have names for any of them until the anonymous tip identified the Defendant. Detective Hawkins agreed he did not attempt to obtain a search warrant after learning the Defendant's identity and knowing the Defendant would probably be inside the home. Detective Hawkins said that he arrived at the home around midnight, although other detectives and deputies had been waiting down the road from the home. He said that although he knew the Defendant's identity, the Defendant's address, and the location of the Dodge Charger, he did not attempt to obtain an arrest warrant or search warrant.

Detective Hawkins testified that he and the detectives yelled "pretty loud" for the Defendant to come out of the bedroom but that the door was closed. Detective Hawkins said that Mr. Hinerman said "that's where he's staying at" when identifying the Defendant's bedroom. Detective Hawkins said that he did not hear any noise or commotion coming from the Defendant's bedroom. He agreed he approached the door, turned the doorknob, and opened the door. He agreed that nobody knocked on the door before opening it but said that "we announced when we were going across" from the living room to the bedroom door.

On redirect examination, Detective Hawkins testified that he learned the identity of the person providing the anonymous tip after the Defendant's arrest. Detective Hawkins said that he was investigating the tip at the time he went to Mr. Hinerman's home. Detective Hawkins said Mr. Hinerman stated that the Defendant had been staying at the home for about two weeks.

Joshua Hinerman testified that he allowed the Defendant to live with him due to the Defendant's "having some trouble in Ohio" and thought the location change would help place the Defendant on the right track. Mr. Hinerman said that at the time of the shooting, the Defendant had been living with him for a few weeks. He recalled that he placed a bed and a dresser inside the bedroom for the Defendant and that the Defendant brought his clothes from Ohio. He recalled that the Defendant only had a duffle bag of clothes when he picked up the Defendant at the bus station. Mr. Hinerman said that although he did not require the Defendant to pay rent, the Defendant helped with yardwork and that the Defendant would have been expected to contribute to the household expenses after the Defendant was able to "get back on his feet." Mr. Hinerman recalled that the Defendant had found work with a "mowing company" by the time of the shooting. ,

Mr. Hinerman provided testimony consistent with his trial testimony regarding his schedule on the day of the shooting. He stated that around midnight or 1:00 a.m., he awoke to the police "banging on the door." He said that although he was taken aback by their presence, the officers were friendly and professional, that they explained a man had been

fatally shot, that they asked if the Defendant and codefendant Scott were inside the home, and that Mr. Hinerman confirmed the men were inside the home. Mr. Hinerman said that the officers explained that the police had received information that the Defendant and codefendant Scott were at that home. Mr. Hinerman said that the police asked where they could find the Defendant and codefendant Scott and that Mr. Hinerman identified the respective bedrooms. Mr. Hinerman said that he told the police that codefendant Scott had a handgun because he did not want the police to "just go in there, guns ablazing [sic]." He recalled that the officers allowed him to put up his three cats before the officers entered the home. He said that he sat at the kitchen table after the police entered the home and that from his location, he could not see what happened. When asked if he gave the officers permission to enter the Defendant's bedroom, he said, "I gave them permission to come into my home, yes." He said he knew the officers were "going to get" the Defendant from the bedroom. Mr. Hinerman said the officers did not point a weapon at him.

On cross-examination, Mr. Hinerman testified that he prepared the bedroom for the Defendant that had previously been a small home office. Mr. Hinerman said that he placed the bed and dresser inside the bedroom for the Defendant's use and that while the Defendant stayed at the home, the Defendant was the only person who used the bedroom. He said that if the Defendant had been inside the bedroom with the door closed, he would not have "just open[ed] the door" without knocking. He agreed that he would not have barged into the bedroom because "presumably . . . [the Defendant's] got some privacy in his room." He said the Defendant's bedroom door did not have a lock. Mr. Hinerman agreed that the Defendant would have begun paying rent "before too long" and that codefendant Scott paid rent.

The trial court denied the motion to suppress the handgun found inside the Defendant's bedroom. The court found that Mr. Hinerman owned the property and allowed the Defendant to "stay" at the home, that Mr. Hinerman had provided a bedroom where the Defendant could sleep, that the Defendant did not pay rent, and that the Defendant had been at the home for two weeks, after having arrived from Ohio with a few personal items. The court determined that Mr. Hinerman consented to the officers' entering the home and "advised" them that the Defendant and the codefendants, along with a handgun, were inside the home. The court found that while Mr. Hinerman did not testify that he "specifically gave consent" to enter the Defendant's bedroom, Mr. Hinerman consented to the officers' entering the bedroom when he told them where to find the Defendant, knowing they "were going into that room looking for" the Defendant.

The trial court found that the officers announced their presence and attempted to get the Defendant to come out of the bedroom and that they entered the Defendant's bedroom when he did not respond. The court determined that Mr. Hinerman and the Defendant had

-20-

"joint authority based on the limited period of time" that the Defendant had been at the home. The court found that although Mr. Hinerman believed the Defendant "had some privacy" inside the bedroom, no evidence showed that Mr. Hinerman was "excluded from that room." The court found that Mr. Hinerman authorized the police to enter the bedroom and determined that the police had consent to the enter the bedroom.

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals from unreasonable searches and seizures. *See* U.S. Const. amend. IV; Tenn. Const. art. 1, § 7. Warrantless seizures are "presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the . . . seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997); *see Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971); *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000).

One such exception to the warrant requirement exists for a search conducted pursuant to valid consent. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Consent for a warrantless search may be given by the defendant or by "a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974); *see State v. Talley*, 307 S.W.3d 723, 734 (Tenn. 2010). Common authority is shown by mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched. *Matlock*, 415 U.S. at 172 n.7; *see Bartram*, 925 S.W.2d at 231.

The record reflects that the Defendant had been allowed to stay at the home for a couple of weeks at the time of the shooting. Mr. Hinerman consented to the officers' entering the home for the purposes of arresting the Defendant and the codefendants after Mr. Hinerman told the police all three people, along with a firearm, were inside the home. Mr. Hinerman knew the police were going to enter the Defendant's bedroom, and he did not prohibit the police from entering when the Defendant did not respond to police commands for the Defendant to leave the bedroom. Although Mr. Hinerman believed the Defendant had some privacy inside the bedroom he created for the Defendant, the bedroom door did not have a lock, the Defendant did not pay rent, and the evidence presented did not show that Mr. Hinerman was excluded from the bedroom. Therefore, the record supports the trial court's determination that Mr. Hinerman had joint authority in the bedroom and that Mr. Hinerman consented to the officers' entering the home and the Defendant's bedroom. The Defendant is not entitled to relief on this basis.

### III. Intoxication Jury Instruction

The Defendant contends that the trial court erred by failing to provide an intoxication jury instruction. He argues that the evidence established that he was intoxicated at the time of the shooting, which warranted an instruction. The State responds that the trial court did not err by refusing to provide an intoxication jury instruction. We agree with the State.

After the proof, the parties and the trial court discussed the Defendant's requested jury instruction on intoxication. The defense argued that the Defendant's intoxication was established by the proof, but the trial court found that it had not been raised by the proof because the Defendant did not present any evidence that he was impaired or impacted by the consumption of alcohol. The court noted that the Defendant testified about what occurred in detail and never stated he had been impaired. Trial counsel stated that codefendant Henning testified that the Defendant was intoxicated, but the trial court found that she did not provide "any specifics about how that impaired [his] actions." The court allowed the parties to review the case law and to present arguments the next day of the trial. When the trial resumed the following morning, the court stated that it had sent the parties the proposed jury instructions the previous night and asked if the parties needed to discuss anything before closing arguments. The prosecutor and trial counsel each responded, "No, your Honor." Intoxication was not included in the final jury instructions.

A criminal defendant has "a right to a correct and complete charge of the law." *Hanson*, 279 S.W.3d at 280 (citing *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000)). As a result, a trial court has a duty "to give proper jury instructions as to the law governing the issues raised by the nature of the proceeding and the evidence introduced at trial." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (citing *Dorantes*, 331 S.W.3d at 390); *see State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). A jury instruction related to general defenses is not required to be submitted to the jury "unless it is fairly raised by the proof." T.C.A. § 39-11-203(c) (2014). An erroneous jury instruction, though, may deprive the defendant of the constitutional right to a jury trial. *See Garrison*, 40 S.W.3d at 433-34.

Our supreme court has concluded that sufficient evidence to fairly raise a general defense "is less than that required to establish a proposition by a preponderance of the evidence." *Hawkins*, 406 S.W.3d at 129. A trial court's determination in this regard "must consider the evidence in the light most favorable to the defendant and draw all reasonable inferences in the defendant's favor." *Id*.; *see State v. Sims*, 45 S.W.3d 1, 9 (Tenn. 2001); *Johnson v. State*, 531 S.W.2d 558, 559 (Tenn. 1975); *State v. Bult*, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998); *see also State v. Shropshire*, 874 S.W.2d 634, 639 (Tenn. Crim. App. 1993). If evidence has been presented which reasonable minds could accept as a

defense, "the accused is entitled to appropriate instructions." *Johnson*, 531 S.W.2d at 559. A jury instruction is "prejudicially erroneous only if the . . . charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005).

"[I]ntoxication itself is not a defense to prosecution for an offense. However, intoxication, whether voluntary or involuntary, is admissible in evidence, if it is relevant to negate a culpable mental state." T.C.A. § 39-11-503(a) (2018). Voluntary intoxication is defined as "intoxication caused by a substance that the person knowingly introduced into the person's body, the tendency of which to cause intoxication was known or ought to have been known." *Id.* § 39-11-503(d)(3). This court has stated that

> proof of intoxication alone is not a defense to a charge of committing a specific intent crime nor does it entitle an accused to jury instructions . . . ; there must be evidence that the intoxication deprived the accused of the mental capacity to form specific intent. An intoxicated person might have . . . intent while a sober person might not.

*Harrell v. State*, 593 S.W.2d 664, 672 (Tenn. Crim. App. 1979); *see State v. Hatcher*, 310 S.W.3d 788, 814-15 (Tenn. 2010). The key inquiry "is not whether the accused was intoxicated, but what was [the person's] mental capacity." *Id.*

The Tennessee Pattern Jury Instructions state, in relevant part:

> Intoxication, whether voluntary or involuntary, is relevant to the issue of the essential element of the defendant's culpable mental state.

> In this case, the state must prove beyond a reasonable doubt the required culpable mental state of the defendant which is [insert definition of specific mental state required for charged and included offenses].

> If you find that the defendant was intoxicated to the extent that *[he] [she]* could not have possessed the required culpable mental state, then *[he] [she]* cannot be guilty of the offense charged.

T.P.I.–Crim. 40.02 (23rd ed. 2019).

The evidence presented regarding the Defendant's intoxication came from codefendant Henning and the Defendant. Codefendant Henning testified that after having consumed at least four tallboy beers and one-third of a pint of Fireball, the Defendant was

"[d]runk and angry" when they left the creek, which was mere minutes before the shooting. Although codefendant Henning stated that the Defendant was intoxicated when they left the creek, the Defendant could talk and walk without assistance. The Defendant stated that he drank a couple of beers and one-half pint of Fireball before going to the creek and that by the time they left the creek, he estimated he had consumed a total of six to seven tallboy beers and one-half pint of Fireball.

Although the evidence raised the issue of the Defendant's intoxication, the evidence did not demonstrate that the Defendant's intoxication deprived him of the mental capacity to form the culpable mental state required for an intentional and premeditated killing. The Defendant testified with clarity and specificity about his conduct before and during the shooting, his consumption of alcohol, and the sequence of events leading up to the time of the shooting. As a result, the Defendant "had clear memories about his actions both preceding and during the shooting[], belying any claim that he was so intoxicated as to be unable to form the culpable mens rea of intent and premeditation." *See Hatcher*, 310 S.W.3d at 816. He, likewise, testified that he engaged in the conduct that resulted in the victim's death. He stated that he knew the victim was driving the truck when he fired the handgun and that he meant to fire the handgun at the truck. Therefore, we conclude that the record supports the trial court's determinations and that the court did not err by denying the Defendant's request for an intoxication instruction. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE